No. 20-3730

_____

## UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

_____

GERALDINE TYLER, on behalf of
herself and all others similarly situated,

Appellant,

v.

HENNEPIN COUNTY, and
MARK V. CHAPIN, Auditor-Treasurer,
in his official capacity,

Appellees.

_____

On Appeal from the United States District Court
for the District of Minnesota
Honorable Patrick J. Schiltz, District Judge
Case No. 20-CV-0889 (PJS/BRT)

_____

## APPELLANT'S REPLY

_____

DAVID J. DEERSON
Pacific Legal Foundation
930 G Street
Sacramento, CA 95814
Telephone: (916) 419-7111
Email: DDeerson@pacificlegal.org

CHRISTINA M. MARTIN
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
Telephone: (561) 691-5000
Email: CMartin@pacificlegal.org

*Additional attorneys for Appellant on subsequent page*

CHARLES R. WATKINS
Guin, Stokes & Evans, LLC
321 S. Plymouth Ct., Ste. 1250
Chicago, IL 60604
Telephone: (312) 878-8391
charlesw@gseattorneys.com

GARRETT D. BLANCHFIELD
g.blanchfield@wblawfirm.com
ROBERTA A. YARD
r.yard@rwblawfirm.com
Reinhardt Wendorf & Blanchfield
332 Minnesota Street, Suite W-1050
St. Paul, MN 55101
Telephone: (651) 287-2100

VILDAN TESKE
teske@teskekatz.com
MARISA KATZ
katz@teskekatz.com
Teske Katz, PLLP
222 South Ninth Street, Suite 1600
Minneapolis, MN 55402
Telephone: (612)767-0521

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................... 1

ARGUMENT ................................................................................. 3

  I.    BY TAKING MORE THAN WHAT TYLER OWED, THE COUNTY EFFECTED AN UNCONSTITUTIONAL TAKING .... 3

      A. Tyler has a deeply rooted property right  in her property, including her equity .................................................... 5

      B. The weight of authority supports Tyler's takings claims ...... 11

      C. *Rodgers* does not support the County's uncompensated taking of Tyler's property ............................ 19

  II.   THE COUNTY VIOLATED THE EXCESSIVE  FINES CLAUSES BY TAKING TYLER'S EQUITY ......................... 23

  III.  ALTERNATIVELY, THE COUNTY VIOLATED SUBSTANTIVE DUE PROCESS OR IS LIABLE FOR UNJUST ENRICHMENT ................................................... 27

      A. Substantive due process ......................................... 27

      B. Unjust enrichment ................................................. 30

CONCLUSION ........................................................................ 32

CERTIFICATE OF COMPLIANCE ........................................ 34

CERTIFICATE OF SERVICE ................................................. 35

Appellate Case: 20-3730    Page: 3    Date Filed: 06/16/2021 Entry ID: 5045898

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. DeLisle,*
    352 N.W.2d 794 (Minn. Ct. App. 1984) ................................................ 31

*Austin v. United States,*
    509 U.S. 602 (1993) ....................................................................... 24–25, 27

*Bennett v Hunter,*
    76 U.S. 326 (1869) .................................................................................. 5

*City of Auburn v. Mandarelli,*
    320 A.2d 22 (Me. 1974) ....................................................................... 16

*Coleman through Bunn v. District of Columbia,*
    70 F. Supp. 3d 58 (D.D.C. 2014) ....................................................... 15

*Coleman through Bunn v. District of Columbia,*
    No. 13-1456, 2016 WL 10721865 (D.D.C. June 11, 2016) ............. 8, 15

*Crane v. Commissioner,*
    331 U.S. 1 (1947) .................................................................................. 3

*Dean v. Michigan Dep't of Nat. Res.,*
    247 N.W.2d 876 (Mich. 1976) ............................................................ 31

*Dudley v. Little,*
    2 Ohio 504 (1826) ............................................................................... 11

*Farnham v. Jones,*
    19 N.W. 83 (Minn. 1884) ........................................................... 9, 13, 27

*Graffam v Burgess,*
    117 U.S. 180 (1886) ........................................................................... 31

*Griffin v. Mixon,*
    38 Miss. 424 (Miss. Err. & App. 1860) ........................................ 18, 29

ii

*Harrison v. Montgomery Cty., Ohio,*
    997 F.3d 643 (6th Cir. 2021) ............................................................ 14

*Hill-Grant Living Tr. v. Kearsarge Lighting Precinct,*
    986 A.2d 662 (N.H. 2009) ................................................................. 14

*Horne v. Department of Agric.,*
    576 U.S. 350 (2015) .................................................................... 12, 22

*Kelly v. Boston,*
    348 Mass. 385 (1965) ...................................................................... 16

*Knick v. Township of Scott,*
    139 S. Ct. 2162 (2019) ................................................................ 17–18

*Lake v Wal-Mart Stores, Inc,*
    582 N.W.2d 231 (Minn. 1998) .......................................................... 14

*Lingle v Chevron U.S.A. Inc.,*
    544 U.S. 528 (2005) ......................................................................... 22

*Loretto v. Teleprompter Manhattan CATV Corp.,*
    458 U.S. 419 (1982) ......................................................................... 12

*Martin v Snowden,*
    59 Va. 100 (1868) ..................................................................... 5–6, 18

*Nelson v. City of New York,*
    352 U.S. 103 (1956) ................................................................. *passim*

*Olson v. United States,*
    292 U.S. 246 (1934) ......................................................................... 17

*Palazzolo v Rhode Island,*
    533 U.S. 606 (2001) ......................................................................... 22

*Phillips v. Washington Legal Found.,*
    524 U.S. 156 (1998) ......................................................................... 11

*Rafaeli v. Oakland County,*
    952 N.W.2d 434 (Mich. 2020) ............................................ 7–8, 14, 20

iii

Appellate Case: 20-3730     Page: 5     Date Filed: 06/16/2021 Entry ID: 5045898

*Ritter v Ross*,
  558 N.W.2d 909 (Wis. Ct. App. 1996) ................................................. 16

*Slater v. Maxwell*,
  73 U.S. 268 (1867) ....................................................................... 10

*State v. Russell*,
  477 N.W.2d 886 (Minn. 1991) ........................................................ 30

*State v. Soto*,
  378 N.W.2d 625 (Minn. 1985) .......................................................... 6

*Stead's Ex'rs v. Course*,
  8 U.S. 403 (1808) ........................................................................ 11

*Tallage Davis, LLC v. Williams*,
  151 N.E.3d 344 (Mass. 2020) ......................................................... 16

*In re Thaw*,
  769 F.3d 366 (5th Cir. 2014) ......................................................... 21

*Thevenin v. Slocum's Lessee*,
  16 Ohio 519 (1847) ...................................................................... 20

*United States v. Bajakajian*,
  524 U.S. 321 (1998) ................................................................ 23–25

*United States v. Rodgers*,
  461 U.S. 677 (1983) ................................................................ 19–21

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ................................................................ 28–29

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
  449 U.S. 155 (1980) ......................................................... 4, 11–12

*Wilson v. Comm'r of Revenue*,
  656 N.W.2d 547 (Minn. 2003) ................................................ 23, 25–27

iv

Appellate Case: 20-3730    Page: 6    Date Filed: 06/16/2021 Entry ID: 5045898

## Statutes

Minn. Stat. § 279.01 subd. 1 ................................................................ 26

§ 279.03 subd. 1a ............................................................................ 26

§ 279.092 ........................................................................................ 26

## United States Constitution

U.S. Const. amend. V ......................................................................... 17

amend. VIII ...................................................................................... 25

amend. XIV ..................................................................................... 5, 9

## Other Authorities

Madison, James, Property, National Gazette, Mar. 29, 1792 ................. 2

Cooley, Thomas M., *Treatise on the Law of Taxation* (1876) .............. 6–7

Waples, Rufus, *A Treatise on Proceedings In Rem* (1882) ................. 9–10

Werner, Derek, *The Public Use Clause, Common Sense and Takings*, 10 B.U. Pub. Int. L.J. 335 (2001) ....................................... 2–3

Appellate Case: 20-3730   Page: 7   Date Filed: 06/16/2021 Entry ID: 5045898

# INTRODUCTION AND SUMMARY OF THE ARGUMENT

To collect $15,000 in property taxes, penalties, interest, and costs, Appellees Hennepin County and its treasurer (collectively "County") took Appellant Geraldine Tyler's Minneapolis condo and sold it for $40,000. It kept all of the proceeds. Because the County took property worth more than what Tyler owed, without just compensation, the County violated the federal and state constitutions.

The County disputes the legal and historical support for Tyler's claims, but it cannot dispute the fundamental fact that it took a valuable home from Ms. Tyler and never paid her any compensation. The County argues Minnesota's legislature may statutorily extinguish property rights without just compensation if it provides notice of the forthcoming taking. County Br. 13–21. But the legislature cannot circumvent the federal or Minnesota takings clauses by simply redefining private property as public property. Nor can procedural safeguards satisfy the constitutional demand that the government pay money when it takes private property. The district court's dismissal of Tyler's takings claims should be reversed.

1

Likewise, the district court erred by dismissing Tyler's excessive fines claims. The County punished Tyler by taking her entire property which was worth at least $25,000 more than she owed. That punishment is unconstitutionally excessive because it is grossly disproportionate to her noncriminal failure to pay $15,000 in penalties, interest, fees, and property taxes.

If not protected by the takings clauses or excessive fines clauses, then Tyler's deeply rooted rights are protected by substantive due process or the doctrine of unjust enrichment. The district court's dismissal of those claims should also be reversed.

In short, the confiscation of Tyler's home without compensation for her surplus equity fails the common law, the Minnesota Constitution, the United States Constitution, and the central purpose of government: the protection of individual liberties and property rights. *See* James Madison, Property, National Gazette, Mar. 29, 1792 ("Government is instituted to protect property of every sort . . . . This being the end of government, that alone is a just government, which impartially secures to every man, whatever is his own."), *quoted in* Derek Werner, *The Public Use Clause,*

2

*Common Sense and Takings*, 10 B.U. Pub. Int. L.J. 335, 337 (2001). This Court should reverse.

## ARGUMENT

## I

## BY TAKING MORE THAN WHAT TYLER OWED, THE COUNTY EFFECTED AN UNCONSTITUTIONAL TAKING

As payment for $15,000 in taxes, penalties, interest, and costs, the County took a home worth substantially more than that. The County asserts Tyler's complaint is about the sale of the property. *See* County Br. 14. But to be clear, Tyler does not allege that the taking occurred because the County sold her property. Tyler would be entitled to just compensation even if the County never sold her former home, because the County took more from Tyler than she owed. Tyler is challenging the uncompensated taking of her home, including the failure to compensate her for her *equity*—the value of her property that exceeded her debt to the government. *See Crane v. Commissioner*, 331 U.S. 1, 7 (1947) ("'[E]quity' is defined as 'the value of a property above the total of the liens.'"). The County also cannot avoid takings liability by arguing about the timing of the taking, *i.e.*, that the taking happened before the sale,

3

when title transferred to the government. The timing of the taking is irrelevant to the question of whether the County effected a taking.

The taking occurred because the County failed to pay Tyler just compensation when it extinguished her rights to the property and transferred it to the County.[1] As Tyler has explained throughout this litigation, private property cannot be legislatively extinguished.[2] The County could, of course, have taken her property in a constitutional manner if it had either paid Tyler just compensation when it took title, or followed the traditional mandate that it sell her property in a fair and public sale and refund the surplus proceeds. It did neither.

---

[1] Tyler has consistently made this point. *See, e.g.*, Appellant's Br. 11–12; App. 13-15, 26, 150.

[2] Perplexingly, the County claims Tyler failed to argue below that the takings clauses "prohibit[ ] the statutory elimination of an 'established property right.'" County Br. 37–38. Throughout the litigation, Tyler has argued that the takings clauses prevent the elimination of her traditional property rights in her property's equity without just compensation. *See, e.g.*, App. 114; App 159 ("Tyler argues that even if no Minnesota statute gives her a property interest in the surplus equity, the common law of Minnesota creates such a right."); ECF Doc. 19, Plaintiff's Memo. in Opposition at 10 ("The statute does not explicitly state its intent to effect such a legislative erasure however and, even if it did, it is of no force or effect. *Webb's* . . . holds that government cannot 'by *ipse dixit* . . . transform private property into public property without compensation.'").

4

## A. Tyler has a deeply rooted property right in her property, including her equity

Tyler's property right in her home and its equity has roots in Magna Carta, was recognized at the time of the founding of the United States and Minnesota, and continued well after the adoption of the Fourteenth Amendment. Appellant's Br. 12–26. The County disputes Tyler's sources, suggesting that the common law traditionally only protected debtors' equity in personal property, and not in real property. County Br. 32–33. The County is mistaken. Tyler's sources, including *Cone* and Blackstone's Commentaries, do discuss the seizure and sale of personal property. But that is only because tax collectors traditionally could not seize real property—either possession or rents from the land—if personal property could satisfy a debt. *See* Magna Carta Cl. 9 ("Neither we nor our officials will seize any land or rent in payment of a debt, so long as the debtor has movable goods sufficient to discharge the debt."); *Martin v Snowden*, 59 Va. 100, 136 (1868), *sub nom. Bennett v Hunter*, 76 U.S. 326 (1869). Discussions of personal property thus occur only against the backdrop of the recognized greater protections for real property. Likewise, the colonies and the states at the founding collected taxes by distress— seizing personal property when available, selling it, and refunding the

5

surplus to the former owner. *See id.* at 137. Only when personal property was not adequate would collectors seize land, and when they did so it was subject to the same requirement of refunding any surplus proceeds. *Id.* at 138–39; *see also State v. Soto*, 378 N.W.2d 625, 628 (Minn. 1985) ("Blackstone had tremendous impact on the development of the common law in the original American colonies and in the early states of this new country."). Thus, the sources discussing the seizure of personal property do, in fact, counsel the Court here to find a taking of Tyler's property.

The County argues that the Court should ignore Thomas Cooley's *Treatise on the Law of Taxation*, since it did not discuss the constitutionality of Tyler's rights in her equity. *See* Appellant's Br. 15–16; County Br. 33. But Cooley's treatise confirms that the United States has traditionally protected debtors' equity in real property in the property-tax context. Cooley first noted that states protect debtors' equity interests by selling only the smallest part of the land necessary to pay the taxes, or by selling it for the highest bid and reserving the "surplus to be deposited," or reserved with a bond, for the former owner. Thomas M. Cooley, *A Treatise on the Law of Taxation* 343 (1876). Cooley then

6

noted that all states "limit the officer's right to sell, to so much as would be requisite to pay the tax and charges," and

> it is not for a moment to be supposed that any statute would be adopted without this or some equivalent provision for the owner's benefit. And such a provision must be strictly obeyed. A sale of the whole when less would pay the tax is void, and a sale of the remainder after the tax had been satisfied by the sale of a part would also be void, for the very plain reason that the power to sell would be exhausted the moment the tax was collected.

*Id.* at 343–44 (1876). Indeed, 150 years since Cooley's observation, most states continue to protect debtors' equity in tax delinquent real property. Appellant's Br. 5–6 n.6.

The concept that property equity belongs to the debtor is so plain that courts historically refused to allow mortgages to give lenders the defaulting debtor's equity. *Rafaeli v. Oakland County*, 952 N.W.2d 434, 476–80 (Mich. 2020) (Viviano, J., concurring). The "harshness" of conveying mortgaged land in fee simple resulting in the "full loss of the mortgagor's interest in the property no matter how much was owed" led to the creation of the "decree of foreclosure" which required a sale and refund of surplus profits to the former owner. *Id.* Such private and voluntary contracts were not subject to the Takings Clause. Yet the courts still recognized that fairness and justice demanded protection for

7

the debtors' property interest that exceeded any loan amount. The courts recognized that equity is a private property interest that "represents an estate in the land" that belongs to the debtor. *Id.* at 481.

The County cannot dispute that this same principle is recognized in Minnesota's mortgage foreclosures, divorce proceedings, and other types of debt collection. *Compare* Appellant's Br. 19 *with* County Br. 33–34. The law's treatment of equity in those contexts demonstrates that Minnesota recognizes equity as private property. Appellant's Br. 19; *cf. Rafaeli*, 952 N.W.2d at 481 (Viviano, J., concurring) ("If more proof were needed that 'equity' is routinely considered the relevant property right in the nondebt value of a house, one need look no further than divorce proceedings, in which home equity is part of the property split between the parties."); *Coleman through Bunn v. District of Columbia* (*Coleman II*), No. 13-1456, 2016 WL 10721865, at *2–3 (D.D.C. June 11, 2016) (because DC law treats equity as private property in other contexts and thus Constitution protects it in context of tax-foreclosures). Indeed, the County cites no authority stating that equity is *not* property. The law's usual treatment of equity also demonstrates that the courts and

Appellate Case: 20-3730    Page: 15    Date Filed: 06/16/2021 Entry ID: 5045898

government are well equipped to protect equity and disburse surplus proceeds to the rightful owners.

Entitlement to compensation for one's home and any equity is not, as the County claims, dependent on legislative grace or explicit recognition. As the Minnesota Supreme Court has previously held, "the right to the surplus exists independently of such statutory provision." *Farnham v. Jones*, 19 N.W. 83, 85 (Minn. 1884). The County provides background about the statutes before and after *Farnham*, but that context merely confirms that, indeed, the surplus value of property has been traditionally protected in Minnesota. And when the statute failed to provide for it, the state's high court in *Farnham* noted that it would be read into the statute. *Id.*; County Br. 29. *Farnham* reasoned that the purpose of seizing property to collect delinquent taxes is "to collect the revenue, and when this is accomplished and a sale made, the proceeds stand in the place of the property as respects the land-owner's rights." *Farnham*, 19 N.W. at 85. Therefore, the tax collector could take only "so much" as needed to clear the "indebtedness charged against the land . . . with the expenses of sale" from the proceeds; the remainder belongs to the former owner. *Id.* The court cited Section 232 of Rufus Waples, *A*

9

*Treatise on Proceedings In Rem* (1882), which states the rule: "An indebted thing cannot be condemned beyond its indebtedness."[3]

The County notes that historically when property failed to attract any buyers, the government was deemed the buyer and consequently there was no surplus realized from the sale. County Br. 27. Based on this, the County implies that when the property is "bid in" and "sold" to the state for the amount of the tax delinquency, the absence of surplus proceeds in that fictitious "sale" shelters the County from Tyler's takings claim. County Br. 29–30, 34 ("Appellant's argument for a 'surplus' in this case is analogous to asking the buyer at mortgage foreclosure sale to compensate the mortgagor when the buyer re-sells to a third party . . . ."). But Government must either pay just compensation when it takes title or hold a *fair and public* sale of the property and remit the surplus. *Slater v. Maxwell*, 73 U.S. 268, 276 (1867) ("It is essential to the validity of tax sales . . . that they should be conducted with entire fairness. Perfect

---

[3] Waples also warned allowing the government to take valuable property as payment for a smaller debt would grant a windfall "without right" to the government and would violate the Constitution. *Id.* § 233. If a private debt collector took such a windfall at the owner's expense, it would be "fraud." *Id.* And if the government committed such a "wrong," it would be "tyranny." *Id.*

Appellate Case: 20-3730     Page: 17     Date Filed: 06/16/2021 Entry ID: 5045898

freedom from all influences likely to prevent competition in the sale should be in all such cases strictly exacted."); *Dudley v. Little*, 2 Ohio 504, 505 (1826) (providing equitable relief for former owner where no competitive bidding at sale); *Stead's Ex'rs v. Course*, 8 U.S. 403, 414 (1808) ("[I]f a whole tract of land was sold when a small part of it would have been sufficient for the taxes . . . the collector unquestionably exceeded his authority."). When Tyler's property was later publicly sold for $25,000 more than she owed, the County still did not pay Tyler. In short, the County took valuable property and failed to pay Tyler just compensation for its surplus value.

## B.    The weight of authority supports Tyler's takings claims

The many federal and Minnesota cases cited by Tyler instruct that government effects a taking when it confiscates more than it is owed. Appellant's Br. 11–31. These cases make clear that the Minnesota and U.S. takings clauses protect Tyler's equity interest in her former home. The government "may not sidestep the Takings Clause by disavowing traditional property interests," or by otherwise redefining property rights. *Phillips v. Washington Legal Found.*, 524 U.S. 156, 167 (1998); *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980);

11

Appellant's Br. 27–29. In other words, Minnesota cannot legislatively grant authority to the County to take Tyler's title *and all her equity* in her property without just compensation.

The County argues that Supreme Court precedent on this point is distinguishable because Tyler had an opportunity to avoid the taking of her private property by paying her debt, whereas the plaintiffs in *Webb's* and *Armstrong* did not. County Br. 23. But an opportunity to avoid a taking cannot defeat a takings claim, as was explained in *Horne v. Dep't of Agric.*, 576 U.S. 350 (2015), which the County ignores. In *Horne*, farmers challenged a law requiring raisin growers to give a portion of their crops to a government program without compensation. *Id.* at 355. The growers could have easily avoided the taking by "sell[ing] their raisin-variety grapes as table grapes or for use in juice or wine." *Id.* at 365. Nevertheless, the Court held that the government effected a taking without just compensation because raisins are private property and the statute purported to allow government to take that property without just compensation. *Id.* at 364–65. *See also Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 439 n.17 (1982) (a taking even though landlord could avoid the taking).

12

In light of the common law and federal takings decisions, it is unsurprising that most state statutes protect property owners' right to compensation. *See* Appellant's Br. 5–6 n.6. And when states have attempted to deviate from the rule, most courts have rejected such attempts. The high courts of Michigan, New Hampshire, Vermont, Mississippi, and Virginia, and several federal district courts, recognize that a property owner's surplus equity is a discrete and legally cognizable property interest and hold that government effects a taking without just compensation when it takes more than it is owed. Appellant's Br. 21–22. The state supreme courts of Indiana, North Dakota, Texas, and Alaska have also criticized the idea that government could legitimately extinguish equity or liens on tax-delinquent properties and have gone out of their way, as the Minnesota Supreme Court did in *Farnham*, to interpret statutes to avoid that result. *Id.* at 22–23.

The United States Supreme Court has done the same thing, and protected owners from confiscation of their equity, by construing tax-foreclosure statutes to avoid that outcome. *See id.* at 16. And recently, in an appeal deciding whether federal courts have jurisdiction over tax forfeiture-based takings cases like this one, the Sixth Circuit confirmed

13

that a district court should "solicit historical evidence about the meaning of a taking in 1791 and 1868 with respect to this kind of government action" to determine whether the government effected a taking, *Harrison v. Montgomery Cty., Ohio*, 997 F.3d 643 (6th Cir. 2021). That history overwhelmingly supports Tyler's claims. Appellant's Br. 12–26.

The County complains that some cases cited by Tyler were decided under their respective state constitutions. County Br. 22. True, *Rafaeli* was decided under the Michigan Constitution. But the Michigan Supreme Court looked to federal case law for guidance, and it closely examined history and the common law to identify debtors' property rights. *Rafaeli*, 952 N.W.2d at 449, 454 ("we draw on authority discussing and interpreting both [takings] clauses"). That same history and case law supports Tyler's federal and Minnesota takings claims here. *See also Lake v Wal-Mart Stores, Inc*, 582 N.W.2d 231, 234 (Minn. 1998) ("To determine the common law, we look to other states as well as to England."). Likewise, *Thomas Tool* and *Polonsky* were decided under the New Hampshire Takings Clause. But New Hampshire's Takings Clause is like the federal counterpart. *Hill-Grant Living Tr. v. Kearsarge Lighting Precinct*, 986 A.2d 662, 665–70 (N.H. 2009). And Minnesota's

Takings Clause offers even greater protection than its federal counterpart. Appellant's Br. 24–25.

The County downplays *Coleman through Bunn v. District of Columbia*, a class action seeking just compensation for homes taken to pay smaller tax debts. County Br. 21. Like the County here, the government in that case argued that *Nelson v. City of New York*, 352 U.S. 103, 110 (1956), barred the takings claims and that the property owners forfeited their rights. *Coleman I*, 70 F. Supp. 3d 58, 68, 77 (D.D.C. 2014). But as the court in *Coleman I* correctly held, *Nelson* "expressly reserved" the question of whether government effects a taking when state law offers no opportunity to obtain compensation in the form of surplus proceeds from a tax sale. *Id.* at 79. Later, the government moved for judgment on the pleadings, claiming no common law sources protected the equity. The court denied that motion because plaintiffs "identified sources of law" other than the tax statute that treated equity as protected property. *Coleman II*, 2016 WL 10721865, at *3. Like the plaintiff in *Coleman*, Tyler has shown that Minnesota normally treats equity as private property and the takings clauses protect her. Appellant's Br. 19–20.

15

A few courts have rejected takings claims like Tyler's primarily based on a misunderstanding of *Nelson*. *See, e.g.*, *City of Auburn v. Mandarelli*, 320 A.2d 22, 31 (Me. 1974); *Ritter v Ross*, 558 N.W.2d 909, 912 (Wis. Ct. App. 1996). The County incorrectly claims support from *Kelly v. Boston*, 348 Mass. 385 (1965). But as the Massachusetts Supreme Court recently clarified, "the parties in [*Kelly*] did not raise any constitutional challenge, and we did not address the constitutionality of the statutory scheme." *Tallage Davis, LLC v. Williams*, 151 N.E.3d 344, 352 n.4 (Mass. 2020). The court also flagged the potential property rights issue raised by the statute, noting "[s]everal . . . sister States have determined that excess value from a tax taking must be made available to the taxpayer as a matter of constitutional law." *Id.*

Likewise, cases arising out of New York such as *Sheehan* and *Nelson* lend no support to the County's position. As the County concedes, the New York tax foreclosure statute gave tax-delinquent owners a "conditional right to recover any of the surplus." County Br. 18. In contrast, Minnesota offers no such opportunity, conditional or otherwise. Instead, it provides only the opportunity "to avoid foreclosure" by paying the underlying debt. *See id.* But requiring that a debtor—already in

16

financial, and often other, distress—find sufficient funds to pay their debt is not the same as paying the debtor compensation for the property that has been taken. The "right to redeem" is not "just compensation" but merely a procedural mechanism allowing an owner time to pay their debt. It does not satisfy the demands of the federal or Minnesota takings clauses. *See Knick v. Township of Scott*, 139 S. Ct. 2162, 2170 (2019) ("[N]o matter what sort of procedures the government puts in place to remedy a taking, a property owner has a Fifth Amendment entitlement to compensation as soon as the government takes his property without paying for it."); *Olson v. United States*, 292 U.S. 246, 255 (1934) (Takings Clause requires payment of "money" for fair market value at the time of the taking).

Because of this important distinction between New York and Minnesota law, *Nelson* did not address Tyler's federal takings claims. *See Nelson*, 352 U.S. at 110 ("But we do not have here a statute which absolutely precludes an owner from obtaining the surplus proceeds of a judicial sale."). Nor did *Nelson* interpret Minnesota's Takings Clause, which is more protective than the federal Takings Clause. *See* Appellant's Br. 24–25 (citing, *e.g.*, *DeCook v. Rochester Int'l Airport Joint Zoning Bd.*,

796 N.W.2d 299 (Minn. 2011)). In fact, *Nelson* did not even arise from "a takings claim against the city," as the County erroneously assumes. *See* County Br. 19. *Nelson* was a due process case in which the takings argument was first raised *in the reply brief* on the merits before the United States Supreme Court. *Nelson*, 352 U.S. at 109. That is why the case focuses heavily on the procedures available, including the right to redeem. *See generally, id.*

And in any event, *Nelson* has recently been called into question by *Knick*, 139 S. Ct. at 2171. *Nelson* essentially held that New York's state court hearing where the plaintiff could obtain compensation if he attended and requested payment before the taking occurred was a suitable substitute for the actual payment of money for a taking. *See* 352 U.S. at 109. But, in *Knick*, 139 S. Ct. at 2171, the Supreme Court held that "a state law procedure that will eventually result in just compensation" does not satisfy the constitutional mandate that government pay just compensation.

Because *Nelson* did not address the question here, the County's attempt to distinguish *Martin*, 59 Va. at 137, and *Griffin v. Mixon*, 38 Miss. 424, 436–37 (Miss. Err. & App. 1860), as too old to be

18

enlightened by *Nelson* also fails. *See* County Br. 22–23. In short, the overwhelming weight of authority supports Tyler's claims for just compensation.

## C. *Rodgers* does not support the County's uncompensated taking of Tyler's property

Despite the clear history and takings cases supporting Tyler's property rights, the County claims that "state tax forfeiture proceedings that extinguish all interests—which would include any equity interest—have long been part of the American legal landscape." County Br. 35–36. For that proposition, the County cites only *United States v. Rodgers*, 461 U.S. 677 (1983). In *Rodgers*, the IRS sought to seize and sell Lucille Rodgers's Texas home to collect $900,000 in IRS income tax debts from her late husband. *Id.* at 687. Under Texas law, Rodgers owned a separate and undivided homestead interest in the family home. *Id.* at 685. The Court held that the federal statute at issue allowed the government to sell the property. But although the federal government had a right to sell the property and collect what it was owed, it could not take more and was required to compensate Rodgers for her interest in the property. *Id.* at 697.

19

The County argues that *Rodgers* supports its position because the federal statute at issue intended to "obtain . . . some of the advantages that many States enjoyed [in 1868] through *in rem* tax enforcement," namely selling properties with various ownership interests like the homestead interest at issue. *Id.* at 695. True, such tax sales would "extinguish[ ]" the debtors' interests in the *title*, but the government was, as here, still only entitled to its "fair share." *See id.* at 694, 697. *Rodgers* supports the states' power to compel sale of indebted property in 1868, but does not address what those states did with the proceeds. *See, e.g.*, *id.* at 693–94. Indeed, the Court specifically cited cases from Michigan, Ohio, and Iowa as exemplifying the sort of procedure the IRS law sought to imitate. *See id*. But to be clear, those states *protected* debtors' equity. *See, e.g.*, *Rafaeli*, 952 N.W.2d at 459 (tracing and re-affirming Michigan's historical requirement that tax collector return surplus proceeds); *Thevenin v. Slocum's Lessee*, 16 Ohio 519, 532 (1847) ("But the legislature have never treated this forfeiture as vesting the title in the state for any other purpose than as security for taxes due and owing. And whenever any of this forfeited land has been sold, it has been done under laws

20

providing that if sold for more than the taxes due, the surplus should be placed to the credit of the former proprietor.").

The County alternatively argues that a property owner who comes into ownership of property after a legislative enactment cannot later allege that provision effects a taking. County Br. 39 (citing *Rodgers*, 461 U.S. at 297, and *In re Thaw*, 769 F.3d 366, 371 (5th Cir. 2014)). There is no such rule. And *Rodgers* noted that a takings claim would be inappropriate only because the statute "provides compensation for that 'taking' by requiring that the court distribute the proceeds of the sale 'according to . . . the interests of the parties.'" *Rodgers*, 461 U.S. at 697–98. Similarly, *In re Thaw*, 769 F.3d at 371, noted the protections in the Bankruptcy Code were "designed to minimize takings concerns," by requiring a sale of the property and "direct[ing] the trustee to apportion and distribute the proceeds of the sale to the non-debtor spouse and to the estate." In contrast, Minnesota's law gave Tyler no opportunity to claim any of the proceeds from the sale of her property or any other form of compensation.

Appellate Case: 20-3730     Page: 28     Date Filed: 06/16/2021 Entry ID: 5045898

Moreover, the Supreme Court in *Palazzolo v Rhode Island*, 533 U.S. 606, 627 (2001),[4] rejected the notion that a post-enactment purchaser cannot challenge a law that causes a taking. The Court reasoned that adopting a rule like that proposed by the County would mean a "newly regulated landowner is stripped of the ability to transfer the interest which was possessed prior to the regulation" putting an expiration date on the Takings Clause." *Id.* "The State may not by this means secure a windfall for itself." *Id.*

Tyler's failure to pay her debt does not entitle the government to take more than what she owed. By failing to pay just compensation when it took Tyler's property and by refusing to follow the traditional protection for debtors—a sale and refund of surplus proceeds—the County effected a taking. Therefore, Tyler stated viable state and federal

---

[4] The County alleges that regulatory takings cases should not be cited in a classic per se takings case like this one. County Br. 38 n.7. The County offers no authority for this novel proposition. Certainly, classic takings do not involve the complex balancing test that courts must use to determine whether a regulation "goes too far" in regulating away the use of property. *See Lingle v Chevron U.S.A. Inc*, 544 U.S. 528, 538 (2005) (explaining the different tests for deciding whether a taking occurs). But Tyler cites the cases appropriately for other principles that apply here. *Cf., e.g.*, *Horne*, 576 U.S. at 362–63 (citing multiple regulatory takings cases, including *Pennsylvania Coal Co. v Mahon*, 260 U.S. 393 (1922)).

Appellate Case: 20-3730     Page: 29     Date Filed: 06/16/2021 Entry ID: 5045898

claims seeking just compensation. The Court should reverse the district court's dismissal of Counts I, II, III, IV, and VII.

## II

### THE COUNTY VIOLATED THE EXCESSIVE FINES CLAUSES BY TAKING TYLER'S EQUITY

Tyler also raises a proper claim that the County imposed an excessive penalty in violation of the federal and Minnesota Excessive Fines Clauses. Punitive fines are unconstitutionally excessive when they are grossly disproportionate to the underlying offense. Appellant's Br. 35; *United States v. Bajakajian*, 524 U.S. 321, 333–34 (1998); *Wilson v. Comm'r of Revenue*, 656 N.W.2d 547, 553 (Minn. 2003). The County does not deny that it was grossly disproportionate to punish Tyler by taking property worth at least $40,000 in satisfaction of a debt of $15,000. *See* County Br. 43. Rather, it argues that the overall purpose of the statute is remedial and therefore taking the whole home as payment for a smaller debt cannot be punitive. *See id.*

But the County undercuts its own argument by conceding that the property tax statute is at least partially aimed at "civil deterrence that encourages the positive behavior of paying one's property taxes." *Id. at* 45. "Deterrence . . . has traditionally been viewed as a goal of punishment

23

. . . ." *Bajakajian*, 524 U.S. at 329. A forfeiture that transcends "the remedial purpose of compensating the Government for a loss" is a punishment. *Id.* Indeed, "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." *Austin v. United States*, 509 U.S. 602, 610 (1993) (quoting *United States v. Halper*, 490 U.S. 435, 448 (1989)). If the statute only took as much as the debtor owed in taxes and costs, it would be remedial. But the statute is not purely remedial; it imposes substantial penalties and higher-than-market interest rates *on top of* eventually extinguishing all equity saved up in that property. *See* Appellant's Br. 36.

The County insists that the Court cannot consider the amount taken—$25,000 in the County's estimation—compared to the underlying property tax debt—$15,000—when deciding whether the fine is a punishment. *See* County Br. 43, 46. But in *Austin*, 509 U.S. at 604, 621, to decide whether the forfeiture of Richard Austin's car and auto body shop was a punishment, the Supreme Court noted that the value of those items was greater than any costs imposed by Austin's violation. "[E]ven

24

assuming" some part of a forfeiture is remedial, the Court reasoned the whole forfeiture could not be fairly deemed remedial, because the property taken did not "correlate[e] to any damages sustained by society or to the cost of enforcing the law." *Id.* (internal quote omitted). *See also Bajakajian*, 524 U.S. at 331 n.6 ("[A] modern statutory forfeiture is a 'fine' for Eighth Amendment purposes if it constitutes punishment even in part . . . .").

Likewise, to determine whether a fine is remedial or punitive under the Minnesota Excessive Fines Clause, the Minnesota Supreme Court compares the costs imposed on the public with the amount taken from the individual. In *Wilson*, 656 N.W.2d at 548–49, an independent contractor to a car dealership failed to pay $45,000 in sales and income taxes to the state. The government served a notice of levy on the dealership to collect approximately 25 percent of the employee's biweekly wages to pay the employee's delinquent tax debt. *Id.* at 549. When the dealership refused, the government assessed the entire $45,000 to the corporate officer responsible for withholding and remitting wages. *Id.* The Minnesota Supreme Court found the assessment against the officer was an excessive fine in violation of the Minnesota and U.S.

25

constitutions. The court reasoned that the assessment against the officer was punitive because it would give the government "substantially more from the employer than [the government] is entitled to receive under the wage levy." *Id.* at 553. Once it determined that the statute was not purely remedial, the court held the fine was excessive. *See id.* at 555–57 (fine excessive because gravity of Wilson's fine was "limited," the state did not impose such large fines in other similar contexts, and excessive compared to other states).

Like in *Wilson*, the County's taking of Tyler's equity—worth at least $25,000 more than Tyler owed—was punitive and excessive. Tyler's $15,000 debt already included all associated costs, including interest and penalties. Minn. Stat. §§ 279.01 subd. 1, 279.03 subd. 1a, 279.092. Although it is unclear because Tyler's case was dismissed before she could conduct discovery, it appears most of the $15,000 debt was costs and penalties. Appellant's Br. 4 n.5. Because all supplemental costs imposed by the debtor are already included in the tax debt, taking more than that $15,000 is punitive. *See Wilson*, 656 N.W.2d at 554.

The County nevertheless asserts that the statute must be remedial because it is not a criminal statute and instead aimed at "collect[ing]

26

taxes to fund public services." County Br. 45. But civil statutes may nevertheless impose a penalty. *Austin*, 509 U.S. at 609–10; *Wilson*, 656 N.W.2d at 553. Moreover, the County's argument that the statute is aimed at collecting taxes supports Tyler's primary claims that this was an uncompensated taking for the public purpose of tax collection. *See Farnham*, 19 N.W. at 85 (where statute's "purpose and aim are to collect the revenue" the former owner has a property "right" to the surplus proceeds from sale of indebted property, regardless of whether a statute recognizes it).

The confiscation of the entire value of Tyler's property constitutes punishment and is an excessive fine. The Court should reverse dismissal of counts V and VI.

## III

## ALTERNATIVELY, THE COUNTY VIOLATED SUBSTANTIVE DUE PROCESS OR IS LIABLE FOR UNJUST ENRICHMENT

### A. Substantive due process

If the takings and excessive fines claims do not provide full relief, then the County violated Tyler's rights to substantive due process under the federal and state constitutions—regardless of the level of scrutiny

27

that applies. Taking Tyler's entire property and refusing to remit any surplus was irrational and unnecessary to collect taxes.

The County incorrectly suggests that only a short list of "enumerated" rights are fundamental: marriage, procreation, parental rights, marital privacy, contraception, and abortion. County Br. 49. Yet the Supreme Court has never provided an exhaustive list of fundamental rights protected by substantive due process. In *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997), the Court noted that "fundamental" rights "include[ ] the rights" identified by the County, and it also described the test courts should use to determine whether other rights are fundamental: the right must be "deeply rooted in this Nation's history and tradition" and required for both liberty and justice in our system. To determine whether an alleged right is "deeply rooted," the Court looked to "over 700 years" of "Anglo-American common law," examining, as Ms. Tyler does here, Blackstone's Commentaries and practices of the colonies and early American states. *Id.* at 711–14.

Tyler provides ample support for the position that her rights as a property owner are deeply rooted, traced back to Magna Carta, extending through the time of the country's founding and well past the adoption of

the Fourteenth Amendment. Appellant's Br. 12–26, 45–48. Although government may seize property to collect a tax, it is liable to pay for the surplus that it takes. Failure to pay violates a fundamental right. *See id.* Tyler amply provides the type of "careful description" of a fundamental right that is required by *Glucksberg*, 521 U.S. at 721.

The County's actions here violate that fundamental right because a narrowly tailored law would require the government to take only as much as necessary to collect statutory taxes, interest, penalties, and fees. Appellant's Br. 44–45, 48. *See, e.g.*, *Griffin*, 38 Miss. at 436–37 (tax foreclosure law unconstitutional partly because government violated "due course of law," when it took property from the former owner "for a nominal consideration"). The County's actions here also offend "judicial notions of fairness" and justice, as numerous courts have recognized. Appellant's Br. 32–23, 48–49.

Even if not a fundamental right, the County's actions violate substantive due process's less-protective standard. *Id.* at 49. There is no reasonable connection between collecting a $15,000 tax and taking $40,000 and keeping the change. *See id.* Consequently, under any level

29

of scrutiny, the County's confiscation of equity violates due process protections.

Tyler also raised a substantive due process claim under the Minnesota Constitution. Appellant's Br. 49. Minnesota's substantive due process protection is greater than federal protection. *See State v. Russell*, 477 N.W.2d 886, 888–89 (Minn. 1991). The law here does not survive even the state's lowest level of scrutiny because there is no reasonable connection between the actual effects of the statute (taking homes worth far more than debtors owe) and the purported statutory goal of collecting taxes. *See Russell*, 477 N.W.2d at 889.

In short, Tyler stated valid substantive due process claims under the Minnesota and federal constitutions. The Court should reverse dismissal of counts IX and X.

## B. Unjust enrichment

The district court also erred in dismissing Tyler's unjust enrichment claim. The County's only defense against that claim is that the tax statute allows the County to take the windfall and the law provided Tyler opportunity to avoid the foreclosure of her property by paying her debt. County Br. 51. But even when a party follows the letter

of the law, those actions may nonetheless be unjust and require relief in equity. *See, e.g.*, *Graffam v Burgess*, 117 U.S. 180, 186 (1886) (Supreme Court provided equitable relief to a widow who lost her home "worth $10,000, to satisfy a paltry claim of less than $200" where the "proceedings were all conducted according to the forms of law"). Indeed, a claim for unjust enrichment may be made where it would be merely "morally wrong for one party to enrich himself at the expense of another." *Anderson v. DeLisle*, 352 N.W.2d 794 (Minn. Ct. App. 1984).

Here, the County knowingly received something valuable—a home worth far more than it was owed—and obtained a windfall. It is inequitable for the County to retain that windfall, and thus, unjust enrichment should provide relief. *See, e.g.*, *Dean v. Michigan Dep't of Nat. Res.*, 247 N.W.2d 876, 880 (Mich. 1976). This Court should reverse the dismissal of Tyler's unjust enrichment claim.

31

## CONCLUSION

The Court should reverse and remand.

DATED: June 15, 2021.

Respectfully submitted,

/s/ Christina M. Martin

CHRISTINA M. MARTIN
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
Telephone: (561) 691-5000
Email: CMartin@pacificlegal.org

DAVID J. DEERSON
Pacific Legal Foundation
930 G Street
Sacramento, CA 95814
Telephone: (916) 419-7111
Email: DDeerson@pacificlegal.org

CHARLES R. WATKINS
Guin, Stokes & Evans, LLC
321 S. Plymouth Ct., Ste. 1250
Chicago, IL 60604
Telephone: (312) 878-8391
charlesw@gseattorneys.com

GARRETT D. BLANCHFIELD
g.blanchfield@wblawfirm.com
ROBERTA A. YARD
r.yard@rwblawfirm.com
Reinhardt Wendorf & Blanchfield
332 Minnesota Street, Suite W-1050
St. Paul, MN 55101
Telephone: (651) 287-2100

32

VILDAN TESKE
teske@teskekatz.com
MARISA KATZ
katz@teskekatz.com
Teske Katz, PLLP
222 South Ninth Street, Suite 1600
Minneapolis, MN 55402
Telephone: (612)767-0521

*Attorneys for Appellants*

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitations of FRAP 32(a)(7)(b)(ii), because this brief contains 6,447 words, excluding the parts of the brief exempted by FRAP 32(f).

2.    This brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Word O365 in 14-point, Century Schoolbook.

DATED: June 15, 2021.

/s/ Christina M. Martin
CHRISTINA M. MARTIN

Appellate Case: 20-3730    Page: 41    Date Filed: 06/16/2021 Entry ID: 5045898

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Christina M. Martin
CHRISTINA M. MARTIN

Appellate Case: 20-3730    Page: 42    Date Filed: 06/16/2021 Entry ID: 5045898